### KIDNEY *et al. v.* THE OCEAN PRINCE.

(*District Court, E. D. Texas.* March Term, 1889.)

SALVAGE—COMPENSATION.

Libelants, 16 in number, were engaged in receiving cotton from lighter-boats, and storing it in the defendant ship, anchored some miles from Galveston. When libelants quit work for the day, 300 or 400 "bales of loose cotton were left on deck, near the kitchen, waiting to" be stored in the hold, where some 4,000 bales had been stored by them. They slept on the ship, and had their own cook during the time they were loading the vessel. About 5 o'clock A. M. the loose cotton bales were discovered by some one to be on fire. The libelants promptly rendered valuable service, which was necessary to assure the safety of the ship and cargo. *Held* that, however valuable and necessary the service of a sailor or passenger may have been in extinguishing a fire which threatens to destroy a vessel, or imperils its cargo and the lives of all on board, it is well known that public policy forbids that either should be rewarded as salvors when the work or service rendered by them is not beyond, but within, the line of such duties as substantially and in the nature of things were in their pre-existing covenant with the vessel; and that the reasons and principles which suggest the public policy mentioned, warrant admiralty courts in considering the libelants' relations to defendant vessel as not essentially different from those of sailors and passengers in a vessel in distress, and in refusing the allowance of salvage reward to them.

(*Syllabus by the Court.*)

In Admiralty.
*Wheeler & Rhodes*, for libelants.
*M. C. McLemore*, for defendant.

BOARMAN, J.  The statement of facts relied on by libelants, and not seriously contradicted by defendant's testimony, is substantially as follows:  The libelants were in the employment of a stevedore who, under a contract with the ship Ocean Prince, was receiving and loading a cargo of cotton.  The ship was at anchor in Outer Roads, about seven miles from Galveston, from which place the cotton with which she was being loaded, was carried in lighter-boats.  The crew of the ship consisted of 20 men.  The libelants, 16 in number, while employed in loading the vessel stayed and slept on her, and had their meals furnished by their own cook.  There were 300 or 400 bales of cotton left by the stevedore's crew on the ship's deck, waiting to be stored in the hold, in which they had already stored 3,000 or 4,000 bales.  The loose cotton bales lying near the ship's kitchen were discovered to be on fire on the night of 11th November, 1887, about 5 o'clock A. M.  The ship and cargo were worth $250,000.  The disputed matters, as shown by the evidence, relate to the question as to whether libelants, or some one of the ship's crew, first discovered and gave the alarm of fire.  They relate to the work, the kind, value, and extent of the efforts made by libelants to extinguish the fire, and as to the degree of danger or peril attending the outbreak, nature, and extent of the fire; and particularly is the testimony contradictory upon the matter as to whether the vessel and cargo, as a matter of fact, were in such imminent peril as to require and make necessary for her protection and rescue the services rendered by libelants.  But the view of the law affecting these libelants, employed on the ship, as they were, by the stevedore, which I shall take, renders it unnecessary to pass upon these disputed matters; yet I think it may be proper to add, as to the last point mentioned in the disputed testimony, that the weight of evidence, the circumstances and conditions shown by it, warrant the belief that the services rendered by the screwmen in connection with the crew were valuable and necessary to assure the safety of the vessel and cargo.  The captain and his crew seem to have been promptly at the place of danger, yet it is not at all certain that serious loss would have been avoided without the aid of libelants.  In other words, if the libelants, related as they then were to the vessel, are or were entitled in law to compensation as salvors, the facts are sufficiently with them to authorize such a reward to be made to them.  It is well settled that a salvor is one who, having no particular relation to a vessel in distress, proffers useful service, and gives it as a voluntary adventurer, without any pre-existing covenant connecting him with the duty of preserving the vessel.  The fire was discovered in the cotton, at night-time.  The libelants, being employed to receive and store the cotton, were at the time sleeping on the vessel, and the fire threatened their lives as well as the ship and cargo.  If the fire had caught in the bales of cotton when they were receiving or storing them away, either in day or night time,

certainly it would have been their duty, under the nature of their contract, to extinguish the fire, or endeavor to protect the cotton from it. It is true, the screwmen were not sailors, and they were not of the ship's crew; nor were they passengers, in the common meaning of the term; and it may be somewhat difficult to define accurately their relations to the ship. But under the rules well recognized as inhering in the principles of law administered in admiralty court, it seems clear enough that in the nature of and by reason of the contract under which libelants were then employed in receiving and storing the ship's cargo of cotton, that particular relations followed and existed between them and the vessel, which made it their duty, in common with all the sailors or passengers on the vessel, to do and render all the services which they did render when they found the ship's self and cargo imperiled by the fire in the cotton bales with which they were loading her. The sense of duty which prompts a sailor to be skillful, daring, and brave, or a passenger to be zealously active in his efforts to rescue his vessel from the perils of the sea, grows out of the reciprocities which substantially inhere in their relations to the ship. However valuable and necessary the service of a sailor or passenger may have been in extinguishing a fire which threatens to destroy a vessel or imperils the cargo and the lives of all on board, it is well known that public policy forbids that either should be rewarded as salvors when the work or service rendered by them is not beyond, but within, the line of such duties as in the nature of things grow out of their well understood relations to the vessel. Without attempting to define more distinctively the relations of libelants to the ship on which they were sleeping when the fire occurred, it seems that their relations to the imperiled vessel were not essentially different from those of a sailor or passenger, which prompts them to zealously render all possible assistance, under the conscription of a sense of duty inhering in a pre-existing covenant rather than as voluntary adventurers. Libelants may have been, and I think they are, entitled to liberal remuneration from the ship's owners; but an allowance to them as salvors cannot be made without violating the rules and principles of law which, in the interests of public policy, courts often liberally construe for the encouragement of men who volunteer valuable services to a vessel in distress. Judgment for defendant.